UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| WENDY GEORGE, on behalf of herself and all others similarly situated,<br><br>          Plaintiff,<br><br>vs.<br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,<br><br>          Defendants. | Case No. 2:16-cv-03006-DCN<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

### Introduction

1.      Less than two years ago, Defendants extricated their automotive operations from class action litigation in this Court on the basis that millions of owners of automobiles with defective dashboards would receive voluntary and comprehensive warranty coverage. That earlier class action was filed by the undersigned counsel on behalf of named plaintiff Melissa Graham and the class on November 10, 2014, and was assigned to the Honorable David C. Norton. *Graham v. Toyota Motor Corp., et al.*, Civil Action No. 2:14-cv-04357-DCN (D.S.C.) (the "Prior Action"). In light of the announced implementation of the warranty program in December 2014, the Prior Action was resolved individually and dismissed.

2.      The warranty program made promises Defendants could not keep. In particular, Defendants commenced the program without adequate replacement parts. Defendants exacerbated

their problem by only permitting consumers to obtain the warranty service at authorized dealers, most of which did not have sufficient inventory. Even today, approximately 1 year and 8 months since the commencement of the program, Defendants are utterly incapable of completing their dashboard warranty obligations in a timely or reasonable fashion. Plaintiff, whose name has been on a wait list and will remain waiting on that list for many more years, will not receive the warranty repair prior to the expiration of the program. Consequently, Plaintiff now seeks to remedy this breach of warranty for herself and a nationwide class of consumers.

### The Parties

3.       Plaintiff Wendy George ("Plaintiff"), is a South Carolina citizen and Mount Pleasant resident. Plaintiff is the owner of a 2004 Lexus RX 330 with Vehicle Identification Number JTJGA31U440007020.

4.       Defendant Toyota Motor Corporation is, at all relevant times, a Japanese corporation with its principal place of business in Toyota City, Aichi Prefecture, Japan. Toyota Motor Corporation is and has been engaged in the business of designing, manufacturing, distributing, marketing, and selling products to consumers in the state of South Carolina and throughout the United States, including the 2003-2005 Toyota 4Runner, the 2005-2010 Toyota Avalon, the 2007-2011 Toyota Camry and Toyota Camry Hybrid, the 2004-2010 Toyota Sienna, the 2004-2008 Toyota Solara, the 2006-2008 Lexus ES 350, the 2003-2008 Lexus GX 470, the 2006-2008 Lexus IS 250/350, the 2007 Lexus LS 460, the 2004-2006 Lexus RX 330, the 2007-2009 Lexus RX 350, and the 2005-2008 Lexus RX 400h.[1] Toyota Motor Corporation regularly

---

[1] The 2003-2005 Toyota 4Runner, the 2005-2010 Toyota Avalon, the 2007-2011 Toyota Camry and Toyota Camry Hybrid, the 2004-2010 Toyota Sienna, and the 2004-2008 Toyota Solara are hereinafter referred to as the "Toyota Subject Vehicles." The 2006-2008 Lexus ES 350, the 2003-2008 Lexus GX 470, the 2006-2008 Lexus IS 250/350, the 2007 Lexus LS 460, the 2004-2006 Lexus RX 330, the 2007-2009 Lexus RX 350, and the 2005-2008 Lexus RX 400h are hereinafter

does business in South Carolina, and its products, including the Subject Vehicles, are regularly sold and used by consumers in South Carolina. It has, therefore, submitted itself to the jurisdiction of this Court

5.     Defendant Toyota Motor Sales, U.S.A., Inc. is, at all relevant times, a foreign corporation with its principal place of business in California. It is a subsidiary of Toyota Motor Corporation. Toyota Motor Sales, U.S.A., Inc. is and has been engaged in the business of designing, manufacturing, distributing, marketing, and selling products to consumers in the state of South Carolina and throughout the United States, including the Subject Vehicles. Toyota Motor Sales, U.S.A., Inc. regularly does business in South Carolina, and its products, including the Subject Vehicles, are regularly sold and used by consumers in South Carolina. It has, therefore, submitted itself to the jurisdiction of this Court.

6.     Defendant Toyota Motor Engineering & Manufacturing North America, Inc. is, at all relevant times, a foreign corporation with its principal place of business in Kentucky. It is a subsidiary of Toyota Motor Corporation. Toyota Motor Engineering & Manufacturing North America, Inc. is and has been engaged in the business of designing, manufacturing, distributing, marketing, and selling products to consumers in the state of South Carolina and throughout the United States, including the Subject Vehicles. Toyota Motor Engineering & Manufacturing North America, Inc. regularly does business in South Carolina, and its products, including the Subject Vehicles, are regularly sold and used by consumers in South Carolina. It has, therefore, submitted itself to the jurisdiction of this Court.

7.     Defendants Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and

---

referred to as the "Lexus Subject Vehicles." Where appropriate, the Toyota Subject Vehicles and Lexus Subject Vehicles are hereinafter collectively referred to as the "Subject Vehicles."

Toyota Motor Engineering & Manufacturing North America, Inc. shall be referred to collectively as "Toyota" or "Defendants."

8.      At all relevant times, Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc. supplied the capital and approvals necessary to design, manufacture, market, and sell the Subject Vehicles.

9.      Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc. employed legal, compliance, and regulatory personnel to make decisions regarding the Lexus Subject Vehicles, regardless of whether Lexus is deemed a brand, subsidiary, or division.   These employees ultimately made or ratified the decisions that allowed the Lexis Subject Vehicles to be sold in breach of its warranties as more fully set forth below.

10.     Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc. are responsible for all representations and warranties made for the Subject Vehicles.  Toyota Motor Engineering & Manufacturing North America, Inc. has additional warranty responsibility.

**Jurisdiction and Venue**

11.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332, which provides for federal jurisdiction in class actions with minimal diversity when damages exceed five million dollars, exclusive of interest and costs.  The Court has supplemental subject matter jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

12.     Plaintiff resides in this district as a South Carolina citizen and Mount Pleasant resident.  Venue is thus appropriate within the contemplation of 28 U.S.C. § 1391.

**Factual Background and Procedural History**

13.     Toyota is a major automotive manufacturer with dealerships throughout the United States, including South Carolina.  Toyota describes itself as "always looking for ways to do things

4

better, and that begins with engineering and manufacturing. Throughout North America, tens of thousands of our team members continually strive to improve not just our cars but everything we do. The reason? Our customers are counting on it."

14.    Toyota maintains a Lexus brand with "the idea that every step of the production process should reflect the Pursuit of Perfection." Lexus markets itself as "associated with quality, luxury and superior customer satisfaction." Moreover, "The Lexus Covenant" explains to customers that "Lexus will win the race because: Lexus will do it right from the start. Lexus will be the finest dealer network in the industry. Lexus will treat each customer as we would a guest in our home."

15.    Unbeknownst to consumers, Toyota designed, manufactured, distributed, marketed, and sold certain automobiles with a particular defect—defective dashboards that melt or degrade upon prolonged exposure to the sun (the "Defect"). The affected models include the Subject Vehicles. Because the nature of the Defect is that the degradation occurs over time, it was a hidden defect from consumers at the time of purchase.

16.    Defendants utilize warranties that provide comprehensive warranty coverage to consumers, generally for the first 3 years or 36,000 miles or the first 4 years or 50,000 miles. However, consumers typically observe the Defect only after the expiration of the warranty coverage.

17.    On December 2, 2011, following the expiration of warranty coverage for most purchasers of the Subject Vehicles, Lexus issued a Technical Service Bulletin ("TSB") designated as L-SB-0144-11 and titled "Interior Panels Sticky/Poor Appearance." The TSB noted that the 2006-2008 Lexus IS 250 and IS 350 "may exhibit sticky interior panels that have a shiny/degraded appearance. These conditions may be present on the Instrument Panel Pad and/or the Door Panel

Trim. Revised interior panels have been developed to address this condition."

18.    TSB L-SB-0144-11 was made available to Lexus dealerships but was not mailed to consumers. Toyota utilized a similar defective dashboard design for the remaining Subject Vehicles but did not issue a comparable TSB for all such vehicles.[2] Toyota did not, at that time, inform owners of the Subject Vehicles that it had developed a fix for the defective dashboards.

19.    As set forth below, Toyota failed to inform consumers that it had developed a fix for the defective dashboards until December 2014, subsequent to the filing of class action lawsuits relating to the Defect.

20.    By issuing a TSB to Lexus dealerships, and knowing that repairs will generally occur outside of warranty, Toyota obtained an additional revenue source when customers paid out of pocket for the repairs. Thus, Toyota obtained further profit from the Defect by shifting responsibility for repair costs and delaying reimbursement for any repair costs for years.

21.    Despite Toyota's superior knowledge of the Defect, Toyota knowingly and deliberately concealed the nature of the Defect and the fix from consumers until approximately December 2014, and only after litigation against Defendants relating to the defective dashboard was commenced.

### Prior Litigation and Toyota's Warranty Enhancement Program

22.    As a result of Defendants' conduct and failure to abide by the original Toyota warranty and the original Lexus warranty (collectively "Original Warranty"), the undersigned

---

[2] On August 31, 2015, Toyota once again issued a limited TSB for certain of its Lexus dashboards. That announcement, reflected in TSB L-SB-0041-15 and titled "Dashboard (Instrument Panel) and Door Panels Sticky Melting/Cracked", covered the 2006-2008 Lexus IS 250/350, but this time added the 2007 LS 460.

counsel filed the Prior Action.[3]

23.    While litigating the Prior Action, Toyota informed the undersigned counsel that the Prior Action should be dismissed because it was voluntarily implementing a nationwide Warranty Enhancement Program (the "Program") for Toyota and Lexus vehicles with cracked, shiny, and/or melting dashboards, purporting to provide "complete relief to customers."[4]

24.    In December 2014, Toyota formally announced the Program with the expectation that the Prior Action, and others like it, would be dismissed because the Program purported to provide complete relief to Toyota's customers.    The formal announcement and promised implementation of the Program effectively eliminated pending class action litigation against Toyota relating to the defect and limited Toyota's "out-of-pocket" liability by promising to reimburse only those customers who had repaired their defective dashboards prior to the implementation of the Program.    Toyota is now in breach of its Program by failing to timely implement the repair component of the Program, leaving millions of consumers with defective dashboards and without any remedy, as set forth more fully below.

25.    As a result of Toyota's representations relating to its Program, and the formal announcement of the implementation of the Program by Toyota in December 2014, the parties in the Prior Action resolved the named plaintiff's individual claims and voluntarily dismissed the Prior Action with prejudice. *See Graham*, Civil Action No. 2:14-cv-04357-DCN, Notice of

---

[3] Plaintiff is aware of at least three other class action cases that were filed as a result of Toyota's conduct and its failure to abide by the Original Warranty. *See Moreno v. Toyota Motor Sales, U.S.A., Inc., et al.*, Case No. 2:14-cv-07636-GHK-FFM (C.D. Cal.) (complaint filed on Oct. 1, 2014); *Carter v. Toyota Motor Sales, U.S.A., Inc., et al.*, Case No. 4:14-cv-03644 (S.D. Tex.) (complaint filed on Jan. 14, 2015); *Perez v. Toyota Motor Sales, USA, Inc.*, Case No. 1:15-cv-21172-JLK (originally filed in the Circuit Court of the 11th Judicial Circuit Court of Miami-Dade County, Florida, No. 14-18947 CA 01 (21); notice of removal entered on March 25, 2015).

[4] *See Perez*, Case No. 1:15-cv-21172-JLK, Dkt. No. 1, at 4.

Resolution of Action, Dkt. No. 8 (Jan. 21, 2015).

26.    In other similar litigation pending at the time, Toyota filed sworn declarations in support of its motions to dismiss in two actions and filed a notice of removal in another, citing the implementation of its Program as a ground for dismissal or summary judgment. For example, on January 14, 2015, Toyota filed the Declaration of Tom Trisdale, Corporate Manager, Quality Assurance Safety & Compliance for Toyota Motor Sales, USA, Inc. *See* Trisdale Decl., *Moreno*, Case No. 1:14-cv-07636-GHK-FFM, Dkt. No. 22-3 (C.D. Cal. Feb. 17, 2015), attached hereto as **Ex. A**. In this declaration, the following sworn statements were made by Toyota to the District Court in support of dismissal, or in the alternative, for summary judgment:

> Since at least early 2014, [Toyota] has been monitoring customer satisfaction issues pertaining to customer complaints that the cosmetic appearance of dashboards and interior door panels of certain Toyota and Lexus vehicles had become cracked, sticky, and/or started to melt over time, primarily including vehicles that are outside of the applicable warranty period.

Trisdale Decl. ¶ 2.

> In May 2014, [Toyota] voluntarily started to design a nationwide Program to address these customer satisfaction issues. The Program was designed and approved before this lawsuit was filed. It was formally announced and implemented by [Toyota] in December 2014, independent of this lawsuit.

*Id.* ¶ 3.

> The Program covers more than 3.4 million Lexus and Toyota vehicles, including [the Subject Vehicles].

*Id.* ¶ 4.

> The Program contains a reimbursement component and a repair component.

*Id.* ¶ 6.

> Under the reimbursement component, [Toyota] is offering full reimbursement to Lexus and Toyota owners who previously paid to repair cracked, sticky, and/or melting dashboards (or interior side and rear panels for certain Lexus vehicles) as a result of heat and/or humidity, regardless of whether the vehicles are within the

warranty period. The reimbursement component has been available since the Program was formally announced in December 2014.

*Id.* ¶ 7.

Under the repair component, [Toyota] is extending the warranty for owners of affected vehicles so that they can have an <u>authorized Toyota or Lexus dealer</u> repair any cracked, sticky, and/or melting dashboards (or interior door panels for certain Lexus vehicles) at no cost to the owner. The repair component extends the warranty for covered Lexus and Toyota vehicles through at least May 2017, regardless of mileage or the date of first use of the Lexus and Toyota vehicle. To the extent the warranty for a particular Lexus and Toyota vehicle has expired, it is extended only for this particular condition and <u>subject to the terms of the Program</u>.

*Id.* ¶ 8 (emphasis added).

For the repair component, the warranty enhancement is being done through primary and secondary coverage. The primary coverage extends the warranty for cracked, sticky, and/or melting dashboards for all covered Lexus and Toyota vehicles (and interior door panels for certain Lexus vehicles) <u>through approximately May 2017</u>, regardless of mileage or date of first use of the vehicle. The secondary coverage supplements the primary coverage for involved owners by extending the warranty coverage for the covered condition for 10 years from the date of the vehicle's first use, regardless of mileage. Thus, for instance, if a covered Lexus or Toyota vehicle was first used on January 1, 2010, the secondary coverage extends through January 1, 2020.

*Id.* ¶ 9 (emphasis added).

Because of limited replacement parts availability from its suppliers [Toyota] has been working with its suppliers to prepare and obtain the volume of parts potentially necessary to complete the repair component for all affected vehicles. The repair component will begin when sufficient replacement parts are acquired—which is <u>expected to be in May 2015</u>. [Toyota] will send owners of covered Toyota and Lexus vehicles another notification letter when repairs are ready to be performed.

*Id.* ¶ 10 (emphasis added).

In December 2014, [Toyota] sent notification letters regarding the details of the Program to authorized Toyota and Lexus dealers and Toyota Region and Lexus Area personnel, and commenced a massive nationwide notification mailing to Toyota and Lexus owners, as identified through [Toyota's] retail and leasing records and vehicle registration data available data [sic] purchased by [Toyota] from R.L. Polk & Company. A true and accurate copy of those letters and communications is attached to this declaration as composite Exhibit 1.

*Id.* ¶ 11.  A virtually identical declaration was filed in *Carter*, Case Number 4:14-cv-03644.  *See*

Trisdale Decl., *id.*, Dkt. No. 10-4, attached hereto as **Ex. B**.

27.    Toyota made similar representations in support of its notice of removal filed in

*Perez*, Case No. 1:15-cv-21172-JLK, on March 25, 2015.  For example, Toyota stated, in pertinent

part, as follows:

> [Toyota] announced the Program in December 2014 and expected that Plaintiffs
> would agree to dismiss or resolve their claims after the announcement of the
> Program because it provides complete relief to customers.
>
> Under the Program, all owners of affected Lexus or Toyota vehicles are eligible to
> be fully reimbursed by [Toyota] for amounts they paid to repair any melting
> dashboard or interior panel condition to those vehicles.  In addition, [Toyota] has
> extended the warranty, so that, among other things, all owners who are currently
> experiencing this condition (no matter how long after they purchased their vehicles)
> or who may later experience this condition can have the dashboard and/or interior
> door panels repaired by an authorized Toyota or Lexus dealer at no charge.

*Id.*, Dkt. No. 1, at 4, attached hereto as **Ex. C**.  Toyota continues, representing that it "formally

announced its Program to owners of Toyota and Lexus vehicles in December 2014[,]" and that it

"covers more than 3.4 million Lexus and Toyota vehicles across the nation[.]" *Id.* at 9.  The notice

of removal also provides that "the repair component will begin—and owners will be given

additional notification—as soon as sufficient replacement parts are acquired to supply to

[Toyota's] dealers nationwide." *Id.* at 10.  Toyota states that this is expected to begin "by the end

of Spring 2015." *Id.*

28.    Attached to the Declaration of Mr. Trisdale are "true and accurate" copies of the

notification describing the Program that were sent to its customers nationwide.  The notification

provided to Toyota owners provided that "Toyota is currently preparing the necessary parts to

implement this Warranty Enhancement Program, and anticipates that it will take several months

to finish preparing and obtaining the necessary parts." **Ex. A,** *Moreno*, Dkt. No. 22-3, at 8 (the

"Initial Notice"); **Ex. B**, *Carter*, Dkt. No. 10-4, at 9.  In the Frequently Asked Questions section of the Initial Notice, Toyota again states that it "anticipates that letters notifying owners that repairs are ready to be performed will begin to be sent in Spring 2015.  We ask that you wait until the remedy owner letter is received before seeking replacement for this cosmetic condition at no cost to you." **Ex. A**, *Moreno*, Dkt. No. 22-3, at 10; **Ex. B**, *Carter*, Dkt. No. 10-4, at 11.

29.    A virtually identical notification was provided to Lexus owners.  *See* **Ex. A**, *Moreno*, Dkt. No. 22-3, at 13-20; **Ex. B**, *Carter*, Dkt. No. 10-4, at 14-21.

30.    Subsequent to this communication, Toyota mailed another notification to its customers (the "Second Notice").  This notification acknowledged the prior communication: "You previously received a notice regarding an extension to portions of your Lexus New Vehicle Limited Warranty for repairs related to cracked and/or sticky/melting Dashboards (Instrument Panels) as a result of heat or humidity." *See* Second Notice, attached hereto as **Ex. D**.  The Second Notice eliminated any and all projected timeframes or timelines for commencement of the repair component of the Program and vaguely stated that customers "may need to wait additional time" for Toyota to remedy the defect:

> **What should you do?**
> If your vehicle has the condition described above, please contact your local authorized dealership.  The dealership will need to verify the condition and order the necessary replacement part(s).  Although Lexus has been diligently preparing replacement parts since before the announcement of the Program, you may need to wait additional time before a replacement part can be obtained and installed in your vehicle, given the size and complexity of dashboard manufacturing, the age, volume, and breadth of the covered vehicles subject to the Program, and the difficulty in predicting consumer demand.

*Id.* (emphasis added).  The Second Notice also eliminated the information related to the timeline for commencement of repairs under the Program in the "Frequently Asked Questions" portion of the communication.

31.     The Second Notice provided to customers, and Toyota's inability to effectuate timely repairs to the Subject Vehicles, has rendered the Program utterly meaningless and useless for millions of consumers.

**Toyota's Program Leaves Consumers Without an Appropriate Remedy**

32.     Approximately 1 year and 8 months after the Initial Notice was disseminated to consumers and the formal announcement of the Program was issued by Toyota, and approximately 1 year and 3 months after the Program's repair component was scheduled to commence, Toyota has yet to repair most of the Subject Vehicles or to provide notification that Toyota is ready to make repairs under the Program.  These delays are particularly pernicious because Toyota's failure has the additional effect of discouraging its customers from signing up for the repairs when there are interminable waits for the relief.  Toyota has thus secured for itself the best of all worlds: it foreclosed litigation by extending warranty relief, but it then squeezed the pipeline of replacement parts, using a May 31, 2017 boundary, so it could control the pace and cost for the relatively small number of repairs actually completed.

33.     Under the Program, Toyota will only provide cash reimbursements to customers for repairs that were made before the implementation of the Program.

34.     For consumers who did not already pay to have the defective dashboard repaired, the only remedy is to have the Subject Vehicle repaired by Toyota pursuant to the Program, which requires all repairs to be performed at an authorized Toyota or Lexus dealer *only. See, e.g.,* Ex. A, *Moreno*, Dkt. No. 22-3, at 8 ¶ 13.

35.     Toyota has failed to meet its obligations under the Program, thereby breaching its promise to owners of Subject Vehicles.  In fact, Toyota has been unable to provide consumers with any realistic timeline for effectuating repairs for the Program set to end in May 2017.  As a result,

Toyota has breached its warranties under its Original Warranty and under its Program, leaving millions of consumers that own Subject Vehicles without an adequate remedy.

36.    Contrary to the declarations of Mr. Trisdale, Toyota has been monitoring customer complaints concerning its defective dashboard since at least 2011, when it issued the first Technical Service Bulletin, L-SB-0144-11, to Lexus dealerships.

37.    Further, Mr. Trisdale's declaration in support of Toyota's motion to dismiss, filed on February 17, 2015, was only 2½ months prior to the expected May 2015 commencement of the repair component.  Toyota knew, or as a sophisticated corporation should have known or was reckless in not knowing before declaring otherwise in federal court, that it did not, and in fact would not in the foreseeable future, have sufficient parts to implement the repair component of the Program, rendering its Program and its promises made to its customers (and to numerous federal courts in support of dismissal) utterly worthless and meaningless.

38.    Additionally, the Primary Coverage under the Program expires on May 31, 2017. *See*, *e.g.*, Ex. D.  This deadline is approximately 9 months away, and millions of vehicles remain unrepaired under the Program with no concrete timeline for repair being provided to consumers. The Secondary Coverage supplements the Primary Coverage for "some owners" by offering the Program for 10 years from the date of first use.  Even in some of the later model Subject Vehicles, 10 years from the date of first use will expire before Toyota is able to effectuate a repair.  Toyota should be required to timely repair the Subject Vehicles or pay Plaintiff and the class the value associated with the replacement dashboards.

**Plaintiff Wendy George's Experience**

39.    Plaintiff is the owner of a 2004 Lexus RX 330 with Vehicle Identification Number JTJGA31U440007020.  The dashboard defect was latent and not known at the time of purchase.

Eventually, as with many other Subject Vehicles, the dashboard began to degrade.

40.     Approximately 1 year and 8 months ago, Plaintiff received the Initial Notice and Program information from Toyota.  As requested by Toyota, Plaintiff contacted her local authorized dealership, Hendrick Lexus Charleston (the "Dealership"), and requested that her defective dashboard be replaced.  Plaintiff was informed by the Dealership that the replacement parts would be available soon and that she would be notified when the replacement parts for her defective dashboard were received by the Dealership so that her vehicle could be repaired.

41.     Plaintiff received the Second Notice from Toyota (*see* Ex. D), and, as instructed, Plaintiff again contacted the Dealership to check on the status of her requested repair.  Plaintiff was, once again, informed that replacement parts would be available soon.  Plaintiff subsequently made numerous telephone calls to the Dealership in an attempt to have her vehicle repaired and was repeatedly told that she was on the list, that replacement parts would be available soon, and that she would be notified when the replacement parts arrived so that her defective dashboard could be repaired.

42.     Plaintiff telephoned the Dealership in approximately April 2016 and spoke with the head of the service department.  During this telephone call, Plaintiff stated that it had been over 1 year since she initially contacted the Dealership and that Toyota was taking far too long to repair her defective vehicle.  The Dealership informed Plaintiff that there were approximately 800 customers on the waiting list (which has likely grown since that time), and that the Dealership had only received approximately 25 parts during the past 6 months to repair the Subject Vehicles.  Plaintiff asked for the expected repair date for her vehicle and asked if Toyota would repair her vehicle in less than 5 years.  The Dealership informed Plaintiff that it could not guarantee that the repairs to her defective vehicle would be made within 5 years because Toyota was not providing

the Dealership with sufficient parts to keep up with the number of Subject Vehicles that needed to be repaired.  The Dealership then instructed Plaintiff to contact Toyota/Lexus headquarters to receive a more concrete determination on the timeline for her repair and provided Plaintiff with a contact number.

43.    As instructed, Plaintiff contacted Toyota/Lexus headquarters.  The Toyota/Lexus representative apologized to Plaintiff for the "inconvenience," stated that Toyota did not correctly anticipate the number of Subject Vehicles that required a dashboard replacement,[5] and stated that Toyota was unable to manufacture the number of parts needed to make repairs in a timely manner.

44.    Plaintiff then asked the Toyota representative if Toyota anticipated being able to repair her vehicle within the next 5 years, and the Toyota representative refused to comment.

45.    As of the date this Complaint was filed, Plaintiff has yet to have her vehicle repaired and has yet to receive a date of anticipated repair.

46.    If the number of parts received by the Dealership (25) over the last 6 months remains at the current rate, it will take approximately 16 years to repair the number of vehicles (800) currently on the waiting list.  In most instances, this timeline for repair would surpass the useful life of the Subject Vehicle.

47.    Toyota breached its Program, leaving millions of customers without a remedy.  As stated above, Toyota should be required to timely repair the Subject Vehicles or pay Plaintiff and the class the value associated with the replacement dashboards.

---

[5]  Contrary to Toyota's representations during this telephone call, and contrary to the representations in its Second Notice that delays were due to the "difficulty in predicting consumer demand," Toyota was aware of the number of Subject Vehicles that required dashboard replacements before the implementation of the Program, as evidenced by the declarations of Tom Trisdale.

**Class Action Allegations**

48.     Under Fed. R. Civ. P. 23, Plaintiff brings this action on behalf of herself and the

class, initially defined as:

>       All United States residents who own a Subject Vehicle.

49.     Excluded from the class are:

>       A.      Defendants and any entity in which Defendants have a
>               controlling interest, and their legal representatives,
>               employees, officers, directors, assigns, and successors;
>
>       B.      The judge, magistrate, and any special master to whom this
>               case is assigned, and any member of their immediate
>               families;
>
>       C.      Any United States residents who have received full
>               monetary reimbursement from Toyota for a prior repair
>               under the Program or who have had their Subject Vehicle
>               repaired by Toyota under the Program; and
>
>       D.      To the extent the class certification order permits exclusion,
>               all persons who timely submit proper requests for exclusion
>               from the plaintiff class.

50.     The class consists of all United States residents who own a Subject Vehicle. The

Subject Vehicles were sold to at least 3.4 million customers nationwide, thus making individual

joinder impracticable pursuant to Fed. R. Civ. P. 23(a)(1). The disposition of the claims in a single

class action will provide substantial benefits to all parties and to the Court, including the just,

speedy, and inexpensive determination of this matter. The class consists of millions of members

across the nation, and the extended warranty at issue provided by Toyota to its customers is

identical with respect to each class member. Moreover, the members of the class are readily

identifiable through the records and transaction data kept by Toyota, as evidenced in the

Declarations of Tom Trisdale. *See* Ex A., Dkt. No. 22-3, at 11; Ex. B, Dkt. No. 10-4, at 4

(declaring that Toyota sent notification letters to all "Toyota and Lexus owners, as identified through [Toyota's] retail and leasing records and vehicle registration data available data [sic] purchased by [Toyota] from R.L. Polk & Company.")

51.    Plaintiff's claims are both typical and aligned with the proposed class claims. The damages sustained by Plaintiff are also typical of those sustained by class members. The factual and legal bases of the claims are common to all plaintiff class members and represent a common injury. *See* Fed. R. Civ. P. 23(a)(2).

52.    There are many common questions of law and fact. These common issues include, but are not limited to, whether Defendants administered the Program under a common protocol and then breached the Program for the reasons set forth herein. These common questions of law and fact predominate over individual questions and a class action is the superior means to litigate the claims. *See* Fed. R. Civ. P. 23(b)(3).

53.    There is a well-defined community of interest in the questions of law and fact involved in this matter such that a class action is clearly the superior method for the fair and efficient handling of this dispute. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of potentially millions of owners of Subject Vehicles is impracticable. The damages suffered by individual class members are relatively small on an individual basis, making the acquisition of counsel to represent a class member on an individual basis cost prohibitive, especially when taking into consideration the sophisticated Defendants in this case. The expense and burden of litigation would make it difficult, if not impossible under these circumstances, for the members of the class to individually redress the wrongs done to them by Defendants. However, because of the commonality of the

predominant issues involved in the class claims, defenses, and damages alleged, there will be no difficulty in maintaining this dispute as a class action.

54.     Plaintiff will fairly and adequately represent and protect the interests of the class as required by Fed. R. Civ. P. 23(a)(4).  The named Plaintiff identified in this complaint owns a 2004 Lexus RX 330 and is thus typical of the class members as required by Fed. R. Civ. P. 23(a)(3). Plaintiff has retained competent counsel with experience in class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the class and have the financial resources to do so.  Neither Plaintiff nor her counsel have any interests that are contrary to or adverse to those of the class that Plaintiff seeks to represent.

55.     Certification is also appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants acted or refused to act on grounds that apply generally to the class, thus warranting injunctive or declaratory relief.  Defendants should be required to implement an appropriate, concrete, and timely warranty protocol for its defective dashboards.

56.     Alternatively, should the Court find that Plaintiff cannot meet the requirements of Fed. R. Civ. P. 23(b)(2) or 23(b)(3), the Court should certify liability issues that are susceptible to class-wide proof.

57.     The precise liability issues Plaintiff would seek to alternatively certify will be set forth more fully in her forthcoming motion for class certification; however, those predominant liability issues will necessarily relate to whether Toyota has an obligation to honor and comply with its warranties and whether Toyota's failure to do so is a breach of warranty with its customers.

**FOR A FIRST CAUSE OF ACTION**
**Breach of Express Warranty**

58.     Plaintiff repeats and realleges each and every allegation of this Complaint as if fully set forth herein verbatim.

59.     At all times, Toyota is and has been engaged in the business of designing, manufacturing, distributing, marketing, and selling Toyota vehicles throughout the United States.

60.     At all times, Toyota is and has been a merchant and seller of the Subject Vehicles, and Defendants sold such vehicles to the consumer Plaintiff and the members of the class.

61.     In the course of selling its vehicles, Toyota expressly warranted in writing that the Subject Vehicles were free from defects.

62.     Toyota expressly warranted to the Plaintiff and the members of the class that the Subject Vehicles were merchantable and fit for their ordinary, particular, and intended use and purpose.

63.     Toyota also provided the Program to Plaintiff and the members of the class, thereby expressly warranting that the defective dashboards on the Subject Vehicles would be repaired and expressly warranting that those customers that had previously paid for repairs related to the defect would be fully reimbursed.

64.     Toyota breached its express warranties.  The Subject Vehicles sold by Toyota to Plaintiff and the members of the class were not in merchantable condition, were not fit for the ordinary purpose for which cars are used and/or were not of the same quality as those generally acceptable in the trade.  In fact, the Subject Vehicles, including the vehicle purchased by Plaintiff, were defective from the point of manufacture and sale, thus rendering the product unmerchantable at the time of purchase.

65.     Toyota has breached its express warranties, including its Program, by failing to adequately provide coverage and to repair or correct the dashboard and interior panel defects, leaving millions of customers without a remedy.

66.     Plaintiff and class members have had sufficient direct dealings with either the

Defendants or their agents (dealerships) to establish vertical privity of contract between themselves and Defendants.

67.     The Program provided to Plaintiff and all members of the class provides that the "Warranty Enhancement coverage is fully transferrable to subsequent vehicle owners for the condition and terms specified in the notification letter." *See, e.g.*, Ex. A, Dkt. No. 22-3, at 10; Ex. B, Dkt. No. 10-4, at 11.

68.     Notwithstanding this, privity is not required in this case because Plaintiff and class members are intended third-party beneficiaries of contracts between Toyota and their dealers; specifically, they are the intended beneficiaries of Toyota's warranties. The dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty agreements provided with the Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

69.     Plaintiff took reasonable steps to notify Toyota within a reasonable time that her defective vehicle was not as represented by contacting her authorized Toyota dealer, as instructed by Toyota in the Initial Notice provided to Plaintiff.  Plaintiff was not required to provide notice of the defect to the remote manufacturer; in any event, Toyota received actual notice of the defect because Plaintiff contacted a local authorized Toyota dealer for repairs, as well as its corporate headquarters, and Toyota has failed to repair her vehicle.

70.     As a direct and proximate result of Defendants' breaches, Plaintiff and the members of the class have suffered harm and monetary loss.  The failure of the Subject Vehicles to be as represented and the failure of Toyota to repair the Subject Vehicles is a substantial factor in causing harm to Plaintiff and the class members.

## FOR A SECOND CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability

71.     Plaintiff repeats and realleges each and every allegation of this Complaint as if fully set forth herein verbatim.

72.     Toyota is and was at all relevant times a merchant with respect to motor vehicles.

73.     Plaintiff purchased her defective vehicle from Toyota's authorized agent. At the time of purchase, Toyota and its authorized agents were in the business of leasing and selling vehicles and/or by course of business held themselves out as having special knowledge or skill regarding these vehicles.

74.     A warranty that the Subject Vehicles were in merchantable condition was implied by law in the instant transaction.

75.     The Subject Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used and/or were not of the same quality as those generally acceptable in the trade. In fact, the Subject Vehicles, including the vehicle purchased by Plaintiff, were defective from the point of manufacture and sale, thus rendering the product unmerchantable at the time of purchase. Specifically, the Subject Vehicles were designed, manufactured, distributed, and sold with a defective dashboard and interior panels that Toyota knew were defective and likely to melt or prematurely degrade.

76.     Plaintiff and class members have had sufficient direct dealings with either Defendants or their agents (dealerships) to establish vertical privity of contract between themselves and Defendants.

77.     The Program provided to Plaintiff and all members of the class provides that the "Warranty Enhancement coverage is fully transferrable to subsequent vehicle owners for the condition and terms specified in the notification letter." *See, e.g.*, Ex. A, Dkt. No. 22-3, at 10; Ex.

B, Dkt. No. 10-4, at 11.

78.     Notwithstanding this, privity is not required in this case because Plaintiff and class members are intended third-party beneficiaries of contracts between Toyota and their dealers; specifically, they are the intended beneficiaries of Toyota's warranties. The dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty agreements provided with the Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

79.     Plaintiff took reasonable steps to notify Toyota within a reasonable time that her defective vehicle was not as represented by contacting her authorized Toyota dealer, as instructed by Toyota in the Initial Notice provided to Plaintiff.  Plaintiff was not required to provide notice of the defect to the remote manufacturer; in any event, Toyota received actual notice of the defect because Plaintiff contacted a local authorized Toyota dealer for repairs, as well as its corporate headquarters, and Toyota has failed to repair her vehicle.

80.     As a direct and proximate result of Defendants' breaches, the Plaintiff and the members of the class have suffered harm and monetary loss.  Defendants' practice of selling the Subject Vehicles, which did not have the expected quality, is a substantial factor in causing harm to Plaintiff and the class members.

**FOR A THIRD CAUSE OF ACTION**
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq.***

81.     Plaintiff repeats and realleges each and every allegation of this Complaint as if fully set forth herein verbatim.

82.     This Court has jurisdiction to decide claims brought under 15 U.S.C. §§ 2301, *et seq.* by virtue of 28 U.S.C. § 1332(a)-(d).

83.     Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

84.     Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 (4)-(5).

85.     The Subject Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

86.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

87.     Toyota's express warranties, including its Original Warranty and its Program, are warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Subject Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

88.     Toyota breached its Original Warranty and the Program by failing to repair the Subject Vehicles' defective dashboards and interior panels, by providing Subject Vehicles not in merchantable condition and not fit for the ordinary purpose for which vehicles are used, and by failing to cure defects and nonconformities once they were identified.

89.     Plaintiff and the members of the class have had sufficient direct dealings with Toyota or its agents (dealerships) to establish privity of contract between Plaintiff and the class members.

90.     The Program provided to Plaintiff and all members of the class provides that the "Warranty Enhancement coverage is fully transferrable to subsequent vehicle owners for the condition and terms specified in the notification letter." *See, e.g.*, Ex. A, Dkt. No. 22-3, at 10; Ex. B, Dkt. No. 10-4, at 11.

91.     Notwithstanding this, privity is not required in this case because Plaintiff and class

members are intended third-party beneficiaries of contracts between Toyota and their dealers; specifically, they are the intended beneficiaries of Toyota's warranties. The dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty agreements provided with the Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

92.     Plaintiff fully satisfied any obligations under 15 U.S.C. § 2310(a)(3) and also provided Toyota with opportunities to cure, even though no such opportunity is required in these circumstances.

93.     Even so, requiring an informal dispute settlement procedure, or affording Toyota a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Subject Vehicle, and again at the time of the formal announcement and implementation of the Program, Toyota knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Subject Vehicles' inability to perform as warranted and of its misrepresentations relating to its ability to implement the repair component of the Program within the stated, or even a reasonable, timeframe. Toyota has, nonetheless, failed to rectify the situation or implement an adequate remedy. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement—whether under the Magnuson-Moss Warranty Act or otherwise—that Plaintiff resort to an informal dispute resolution procedure or afford Toyota a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

94.     In any event, it is not necessary for Plaintiff to participate in an informal dispute settlement procedure. Defendants' Original Warranty for the Lexus RX 330 required consumers to arbitrate via the BBB Auto Line (administered by the Council of Better Business Bureaus).

Under the applicable procedures, the result is not binding on consumers. The BBB Auto Line, however, no longer provides such services for Lexus and Toyota customers. Although Defendants now utilize the National Center for Dispute Settlement ("NCDS") for informal dispute settlement procedures, NCDS does not render services associated with extended warranties provided by Defendants, including the Program.

95.    Plaintiff and the class members would suffer economic hardship if they returned their Subject Vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the members of the class have not reaccepted the Subject Vehicles by retaining them.

96.    The amount in controversy of Plaintiff's individual claim meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

97.    Plaintiff seeks all damages, including diminution in the value of their vehicles, in an amount to be proven at trial. Alternatively, Plaintiff seeks to revoke acceptance of the Subject Vehicles.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays that the Court enter judgment against Defendants and in favor of the Plaintiff and the class and award the following relief:

A.    Certification of the proposed class under Fed. R. Civ. P. 23;

B.    Appointment of Wendy George as class representative;

C.    Appointment of the undersigned attorneys as class counsel;

D.    Finding that the Defendants' conduct constitutes a breach of express and/or implied warranty;

E.    Finding that the Defendants' conduct constitutes a violation of the Magnuson-Moss Warranty Act;

F.    An award of injunctive relief, compensatory damages, and attorneys' fees; and

G.    Such other and further judiciary determinations and relief as may be appropriate in this proceeding.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

September 1, 2016                                 Respectfully submitted,

                                                 RICHARDSON, PATRICK,
                                                 WESTBROOK & BRICKMAN, L.L.C.

                                                 /s/ T. Christopher Tuck
                                                 T. Christopher Tuck, ID No.: 9135
                                                 E-mail: ctuck@rpwb.com
                                                 A. Hoyt Rowell, III, ID No.: 3665
                                                 E-mail: hrowell@rpwb.com
                                                 James L. Ward, Jr., ID No.: 6956
                                                 E-mail: jward@rpwb.com
                                                 Robert S. Wood, ID No.: 7965
                                                 E-mail: bwood@rpwb.com
                                                 Catherine H. McElveen, ID No.: 10775
                                                 E-mail: kmcelveen@rpwb.com
                                                 1037 Chuck Dawley Blvd.
                                                 Building A
                                                 Mt. Pleasant, SC  29464
                                                 843.727.6500

LAW OFFICES OF
MARK C. TANENBAUM, PA
Mark C. Tanenbaum, ID No.: 4017
E-mail:  mark@tanenbaumlaw.com
Mia Lauren Maness, ID No.: 5457
E-mail: mia@tanenbaumlaw.com
241-243 East Bay Street
Charleston, SC  29401
843.577.5100

ATTORNEYS FOR PLAINTIFF